# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ALBANY

------------------------------------------------------------- X

STATE OF NEW YORK,                              :    **Index No.**
                                                :
                        Plaintiff,              :
                                                :
                                                :    **SUMMONS**
                        - against -             :
                                                :
3M COMPANY, TYCO FIRE PRODUCTS LP,              :
CHEMGUARD, INC., BUCKEYE FIRE                    :
EQUIPMENT COMPANY, NATIONAL FOAM,               :
INC., and KIDDE-FENWAL, INC.,                   :
                                                :
                        Defendants.             :

------------------------------------------------------------- X

**TO:**   3M COMPANY
          TYCO FIRE PRODUCTS LP
          CHEMGUARD, INC.
          BUCKEYE FIRE EQUIPMENT COMPANY
          NATIONAL FOAM, INC.
          KIDDE-FENWAL, INC.


**YOU ARE HEREBY SUMMONED** to answer the attached complaint in this action and

to serve a copy of your answer on the plaintiff's attorney within twenty (20) days after the

service of this summons, exclusive of the day of service (or within thirty (30) days after service

is complete if this summons is not personally delivered to you within the State of New York). In

case of your failure to appear or answer, judgment will be taken against you by default for the

relief demanded in the complaint.

        Pursuant to CPLR 503, the venue for this action is Albany County, because plaintiff

resides in Albany County.

Dated: Albany, New York
      June 19, 2018

BARBARA D. UNDERWOOD
Attorney General of the State of New York
Attorney for Plaintiff


By:   /s/ Matthew J. Sinkman
      Matthew J. Sinkman
      Philip Bein
      Assistant Attorneys General
      Environmental Protection Bureau
      The Capitol
      Albany, New York 12224
      Matthew.Sinkman@ag.ny.gov
      Philip.Bein@ag.ny.gov
      (212) 416-8446
      (518) 776-2413

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ALBANY

------------------------------------------------------------- X

STATE OF NEW YORK,                           :   **Index No.**
                                             :
            Plaintiff,                       :   **COMPLAINT**
                                             :
         - against -                         :
                                             :
3M COMPANY, TYCO FIRE PRODUCTS LP,           :
CHEMGUARD, INC., BUCKEYE FIRE                 :
EQUIPMENT COMPANY, NATIONAL FOAM,            :
INC., and KIDDE-FENWAL, INC.,                :
                                             :
            Defendants.                      :

------------------------------------------------------------- X

      Plaintiff State of New York (the "State"), by its attorney Barbara D. Underwood, Attorney

General of the State of New York, as and for its complaint against 3M Company, Tyco Fire Products

LP, Chemguard, Inc., Buckeye Fire Equipment Company, National Foam, Inc., and Kidde-Fenwal,

Inc. (collectively, "defendants"), alleges as follows:

## NATURE OF THIS ACTION

      1.    This action arises from threats to public health and contamination of the

environment caused by toxic substances in defendants' products.

      2.    Defendants designed, manufactured, marketed, and sold aqueous film-forming

foam and related products ("AFFF") that were discharged into the environment at or from sites

throughout New York.

      3.    AFFF is a product that has been used to extinguish fires involving fuel or other

flammable liquids, including aviation fires and fires in aircraft hangars extinguished with

automatic fire suppression systems; to train firefighters; and to test firefighting equipment.

Defendants' AFFF products contained the chemical compounds perfluorooctanoic acid/

perfluorooctanoate ("PFOA"), perfluorooctane sulfonic acid/perfluorooctane sulfonate

("PFOS"), and/or chemical compounds that degrade into PFOA and/or PFOS (collectively,

"PFOA/S").  Human exposure to PFOA is associated with an increased risk of kidney and

testicular cancer, ulcerative colitis, and other conditions.  Human exposure to PFOA and PFOS is

associated with an increased risk of immune system effects, changes in liver enzymes and

thyroid hormones, low birthweight, and other adverse health conditions.

4.      The State brings this action to recover (1) damages consisting of costs incurred

and to be incurred by the State in investigating, monitoring, remediating, and otherwise

responding to injuries and/or threats to public health and the environment caused by defendants'

AFFF products; and (2) damages arising from harm to the State's natural resources.

## PARTIES

5.      The State, as a body politic and sovereign entity, brings this action as *parens*

*patriae* and representative of all residents and citizens of the State, as trustee and guardian of the

State's natural resources, and on its own behalf in its sovereign and proprietary capacities.

6.      On information and belief, defendants' AFFF products containing PFOA/S were

discharged into the environment at or from Stewart Air National Guard Base and Stewart

International Airport in Newburgh and New Windsor, New York; Francis S. Gabreski Airport in

Southampton, New York; the former Plattsburgh Air Force Base in Plattsburgh, New York; and

the former Griffiss Air Force Base in Rome, New York (collectively, the "sites").

7.      Defendant 3M Company ("3M") is a corporation organized under the laws of

Delaware.  On information and belief, 3M designed, manufactured, marketed,  and sold AFFF

products containing PFOA/S that were discharged into the environment at or from the sites

addressed in this complaint.

2

8.     Defendant Tyco Fire Products LP ("Tyco") is a limited partnership organized under the laws of Delaware.  On information and belief, Tyco manufactures the Ansul brand of products and is  the successor-in-interest to the corporation formerly known as The Ansul Company, a corporation organized under the laws of Wisconsin (The Ansul Company, with Tyco, "Tyco/Ansul").  On information and belief, Tyco/Ansul and/or its predecessors designed, manufactured, marketed, and sold AFFF products containing PFOA/S that were discharged into the environment at or from the sites addressed in this complaint.

9.     Defendant Chemguard, Inc. ("Chemguard") is a corporation organized under the laws of Texas.  On information and belief, Chemguard designed,  manufactured, marketed, and sold AFFF products containing PFOA/S that were discharged into the environment at or from the sites addressed in this complaint.

10.     Defendant Buckeye Fire Equipment Company is a corporation organized under the laws of Ohio.  On information and belief, Buckeye Fire Equipment Company designed, manufactured, marketed, and sold  AFFF products containing PFOA/S that were discharged into the environment at or from the sites addressed in this complaint.

11.     Defendant National Foam, Inc. ("National Foam") is a corporation organized under the laws of Delaware.  On information and belief, National Foam manufactures the Angus brand of products and is the successor-in-interest to Angus Fire Armour Corporation, a corporation also organized under the laws of Delaware (National Foam, together with Angus Fire Armour Corporation, "National Foam/Angus").  On information and belief, National Foam/Angus and/or its predecessors designed, manufactured, marketed,  and sold AFFF products containing PFOA/S that were discharged into the environment at or from the sites addressed in this complaint.

3

12.     Kidde-Fenwal, Inc. is a corporation organized under the laws of Delaware.  On information and belief, Kidde-Fenwal, Inc. is the successor-in-interest to Kidde Fire Fighting Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System Inc), a corporation organized under the laws of Pennsylvania.  On information and belief, Kidde-Fenwal, Inc. and/or its predecessors designed, manufactured, marketed, and sold AFFF products containing PFOA/S that were discharged into the environment at or from the sites addressed in this complaint.

## NEW YORK'S UNIQUE ROLE IN PROTECTING PUBLIC HEALTH AND THE ENVIRONMENT

**A.      The State is *Parens Patriae*, Trustee of New York's Natural Resources, and Owner of New York's Fish and Other Wildlife**

13.     The State is *parens patriae* and representative of all residents and citizens of New York and trustee and guardian of New York's natural resources.

14.     The State owns fish and other wildlife in New York "for the use and enjoyment of the people of the state, and the state has a responsibility to preserve, protect and conserve such terrestrial and aquatic resources."  Environmental Conservation Law ("ECL") § 15-0103(8).

15.     It is the policy of the State to "maintain reasonable standards of purity of the waters of the state consistent with public health and public enjoyment thereof, the propagation and protection of fish and wild life . . . and to that end require the use of all known available and reasonable methods to prevent and control the pollution of the waters of the state of New York." *Id.* § 17-0101.

16.     The State's Department of Environmental Conservation ("DEC") and Department of Health ("DOH") protect public health and the environment, including drinking water, surface water, groundwater, land, and wildlife by implementing and enforcing New York and federal statutes and regulations.  *See, e.g.*, Public Health Law § 201(1)(l) (regulating the sanitary aspects

of water supplies, sewage disposal, and water pollution); ECL Art. 17 (protecting surface water and groundwater from water pollution); 6 New York Codes, Rules & Regulations Part 360 (protecting land, surface water, and groundwater from disposal of solid waste); ECL § 27-0913 (regulating the storage, transportation, treatment, or disposal of hazardous waste); ECL § 27-1313 (providing remedial programs for inactive hazardous waste disposal sites); ECL Art. 11 (protecting the State's fish and wildlife).

**B.     The Law of Public Nuisance**

17.     A public nuisance is a condition that offends, interferes with, or causes damage to the public in the exercise of rights common to all, in a manner such as to interfere with use by the public of a public place or endanger or injure the property, health, safety, or comfort of a considerable number of persons.

18.     Injuries and/or threats to drinking water sources, public health, and the environment constitute public nuisances.

19.     A public nuisance is an offense against the State, and the State has standing to abate and/or prosecute public nuisances.

20.     Persons who cause or contribute to the creation or maintenance of a public nuisance are strictly, jointly, and severally liable for its abatement and for all costs, damages, and expenses arising from the public nuisance.

## FACTUAL ALLEGATIONS

**A.     PFOA, PFOS, and the Threats They Pose to Public Health and the Environment**

21.     Poly- and per-fluoroalkyl substances are chemical compounds containing fluorine and carbon atoms.  These substances have been used for decades in the manufacture of, among

other things, household and commercial products that resist heat, stains, oil, and water. These substances are not naturally occurring and must be manufactured.

22.      The two most widely studied types of these substances are PFOA and PFOS, which each contain eight carbon atoms.

23.      PFOA and PFOS have unique properties that cause them to be: (i) mobile and persistent, meaning that they readily spread into the environment where they break down very slowly; (ii) bioaccumulative and biomagnifying, meaning that they tend to accumulate in organisms and up the food chain; and (iii) toxic, meaning that they pose serious health risks to humans and animals. Because PFOA and PFOS have these three properties, they pose significant threats to public health and the environment.

24.      <u>Mobility and persistence in the environment.</u> PFOA and PFOS easily dissolve in water, and thus they are mobile and readily spread in the environment. PFOA and PFOS also readily contaminate soils and leach from the soil into groundwater, where they can travel significant distances.

25.      PFOA and PFOS are characterized by the presence of multiple carbon-fluorine bonds, which are exceptionally strong and stable. As a result, PFOA and PFOS are thermally, chemically, and biologically stable and they resist degradation due to light, water, and biological processes.

26.      <u>Bioaccumulation and biomagnification in the environment.</u> Bioaccumulation occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism and excretion. Biomagnification occurs when the concentration of a substance in the tissues of organisms increases as the substance travels up the food chain.

27.     PFOA and PFOS bioaccumulate/biomagnify in numerous ways.  First, they are relatively stable once ingested, so that they bioaccumulate in individual organisms for significant periods of time.  Because of this stability, any newly ingested PFOA and PFOS will be added to any PFOA and PFOS already present.  In humans, PFOA and PFOS remain in the body for years.

28.     Second, in humans and other mammals, PFOA and PFOS can bioaccumulate by crossing the placenta from mother to fetus and by passing to infants through breast milk.

29.     Third, they biomagnify up the food chain, such as when humans eat fish that have ingested PFOA or PFOS.

30.     <u>Toxic effects in humans and animals.</u>  Exposure to PFOA and PFOS can be toxic and may pose serious health risks to humans and to animals.  Human health effects associated with PFOA exposure include kidney and testicular cancer, thyroid disease, high cholesterol, ulcerative colitis, liver damage, and pregnancy-induced hypertension (also known as preeclampsia).  Human health effects associated with PFOS exposure include immune system effects, changes in liver enzymes and thyroid hormones, low birthweight, high uric acid, and high cholesterol.  In laboratory testing on animals, PFOA and PFOS have caused the growth of tumors, changed hormone levels, and affected the function of the liver, thyroid, pancreas, and immune system.

**B.      Defendants' Development of AFFF Products Containing PFOA/S**

31.     In the 1940s, 3M began using a process called electrochemical fluorination to create carbon-fluorine bonds, which are key components of PFOA and PFOS.  3M soon discovered that these types of substances have strong surfactant properties, meaning that they reduce the surface tension between a liquid and another liquid or solid.  This reduced surface

tension enabled 3M to develop a myriad of products that resist heat, stains, oil, and water. These products included older forms of Scotchgard, which contained PFOS and when applied to fabric, furniture, and carpets protected against liquids and stains.

32.   Building on these earlier experiments, in the early 1960s 3M began developing firefighting foams containing PFOS to suppress flammable liquid fires, which cannot be effectively extinguished with water alone.

33.   AFFF does not have the same problems that water alone does in extinguishing flammable liquid fires. AFFF concentrate containing PFOA/S forms a foam when it is mixed with water and ejected from a nozzle. That foam is then sprayed so that it coats the fire, blocking the supply of oxygen feeding the fire and creating a cooling effect and evaporation barrier to extinguish the vapors on fire. A film also forms to smother the fire after the foam has dissipated.

34.   3M sold AFFF products containing PFOA/S to the United States Department of Defense ("DOD") and others from approximately 1964 through at least 2000.

35.   The other defendants and/or their predecessors also sold AFFF products to DOD, using a telomerization process to manufacture AFFF products containing PFOA/S.

C.   **Defendants' Knowledge of the Threats to Public Health and the Environment Posed by PFOA and PFOS**

36.   On information and belief, by at least the 1970s 3M knew or should have known that PFOA and PFOS are mobile and persistent, bioaccumulative and biomagnifying, and toxic.

37.   Upon information and belief, 3M concealed from the public and government agencies its knowledge of the risk of harm posed by PFOA/S.

38.   In 1975, 3M concluded that PFOS was present in the blood of the general population. Since PFOA/S is not naturally occurring, this finding should have alerted 3M to the

possibility that their products were a source of this PFOS. The finding also should have alerted 3M to the possibility that PFOS might be mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics could explain the absorption of PFOS in blood from 3M's products. In 1976, 3M found PFOA in the blood of its workers. This finding should have alerted 3M to the same issues raised by the findings regarding PFOS in the prior year.

39.     A 1978 study by 3M showed that PFOA reduced the survival rate of fathead minnow fish eggs.

40.     Other studies by 3M in 1978 showed that PFOS and PFOA are toxic to rats, and that PFOS is toxic to monkeys. In one study in 1978, all monkeys died within the first few days of being given food contaminated with PFOS.

41.     Studies by 3M after the 1970s also showed adverse effects from exposure to PFOA/S.

42.     In a 1983 study, for example, 3M found that PFOS caused the growth of cancerous tumors in rats.

43.     A study proposal by 3M in 1983 stated that the resistance to degradation of PFOA and PFOS made them "potential candidates for environmental regulations, including further testing requirements under laws such as the Toxic Substances Control Act." 3M Environmental Laboratory (EE & PC), Fate of Fluorochemicals – Phase II, at p.6 (E. A. Reiner, ed. May 20, 1983).

44.     A 1997 material safety data sheet ("MSDS") for a non-AFFF product made by 3M listed its only ingredients as water, PFOA, and other per-fluoroalkyl substances and warned that the product includes "a chemical which can cause cancer." The MSDS cited "1983 and

1993 studies conducted jointly by 3M and DuPont" as support for this statement. On information and belief, 3M's MSDSs for AFFF did not provide similar warnings.

45.     Federal law requires chemical manufacturers and distributors to immediately notify the United States Environmental Protection Agency ("EPA") if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment." *See* Toxic Substances Control Act ("TSCA") § 8(e), 15 U.S.C. § 2607(e).

46.     3M did not comply with its duty under TSCA, and in April 2006 it agreed to pay EPA a penalty of more than $1.5 million for its failure to disclose studies regarding PFOA/S and other per-fluoroalkyl substances dating back decades, among other things.

47.     On information and belief, all defendants knew or should have known that in its intended and/or common use, AFFF containing PFOA/S would very likely injure and/or threaten public health and the environment. On information and belief, this knowledge was accessible to all defendants. For example, in 1970 a well-established firefighting trade association was alerted to the toxic effects on fish of a chemical compound related to PFOS. On information and belief, at least the following defendants are and/or were members of this trade association: 3M, Tyco/Ansul, Chemguard, and National Foam/Angus.

48.     Additionally, on information and belief, all defendants knew or should have known that their AFFF products and the PFOA/S the products contained easily dissolve in water, because the products were designed to be mixed with water; are mobile, because the products were designed to quickly form a thin film; resist degradation, because that is the nature of the products' chemical composition, and on information and belief the products had long shelf-lives; and tend to bioaccumulate, because studies regarding the presence of substances with carbon-

fluorine bonds in the blood of the general population were publicly available beginning in at least 1976.

**D.    Evolving Understanding of the Levels of Acceptably Safe Exposure to PFOA/S**

49.    As discussed above, neither 3M nor, on information and belief, the other defendants, complied with their obligations to notify EPA about the "substantial risk of injury to health or the environment" posed by their AFFF products containing PFOA/S.  *See* TSCA § 8(e).

50.    In or around 1998, EPA began investigating the safety of PFOA/S after some limited disclosures by 3M and others.

51.    Beginning in 2009, EPA issued health advisories about the levels of exposure to PFOA and PFOS in drinking water that it believed were protective of public health.  As described on EPA's website, "health advisories are non-enforceable and non-regulatory and provide technical information to states[,] agencies and other health officials on health effects, analytical methodologies, and treatment technologies associated with drinking water contamination."  *Drinking Water Health Advisories for PFOA and PFOS*, *What's A Health Advisory?*, *available at* https://www.epa.gov/ground-water-and-drinking-water/drinking-water-health-advisories-pfoa-and-pfos (last visited June 5, 2018).

52.    The recommendations in EPA's health advisories evolved as EPA learned more about PFOA and PFOS.  New York followed these changing advisories in implementing its own approach to investigating contamination from PFOA/S.

53.    On January 8, 2009 EPA issued Provisional Health Advisories for PFOA and PFOS, advising that "action should be taken to reduce exposure" to drinking water containing levels of PFOA and PFOS exceeding 400 parts per trillion ("ppt") and 200 ppt, respectively.  *See* Provisional Health Advisories for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate

(PFOS), *available at https://www.epa.gov/sites/production/files/2015-09/documents/pfoa-pfos-provisional.pdf*, at p.1, n.1 (last visited June 5, 2018).

54.     In January 2016, DEC issued a rule designating one form of PFOA a "hazardous substance" under New York law.  That designation enabled the State to use monies in the State Superfund program to respond to contamination from PFOA.  As DEC and DOH continued to evaluate the scientific data, they determined that PFOS also met the definition of a hazardous substance under New York law.  In April 2016, DEC issued a second rule designating both PFOA and PFOS as hazardous substances.

55.     On or around May 19, 2016, the EPA issued updated Drinking Water Health Advisories for PFOA and PFOS, recommending that drinking water concentrations for PFOA and PFOS, either singly or combined, should not exceed 70 ppt.  *See* Lifetime Health Advisories and Health Effects Support Documents for PFOA and PFOS, 81 Fed. Reg. 33,250-51 (May 25, 2016).

**E.     The Use of Defendants' AFFF Products Containing PFOA/S in New York**

56.     Defendants' AFFF products containing PFOA/S have been used for decades throughout New York at military air bases, civilian airports, firefighting training centers, and other facilities.

57.     The Air National Guard ("National Guard") and United States Air Force ("Air Force"), both entities within DOD, stored AFFF products containing PFOA/S and used and discharged them at the sites.

58.     On information and belief, defendants manufactured and sold AFFF products containing PFOA/S that were used and discharged at these sites.

59.     Defendants' AFFF products containing PFOA/S were included in DOD's Qualified Products List and/or Qualified Products Database, a list of products approved for purchase and use by DOD.

60.     Sampling results of surface water, groundwater, soil, and/or fish at or near these sites demonstrate the presence of elevated concentrations of PFOA/S, which were components in defendants' AFFF products.

61.     On information and belief, defendants did not provide adequate warnings regarding the public health and environmental hazards associated with their AFFF products containing PFOA/S.  Nor did defendants provide adequate instructions about how to avoid or mitigate such hazards.

62.     The normal, intended, and foreseeable manner of storage and use of defendants' AFFF products resulted in the discharge of PFOA/S into the environment.

**F.     The State's Response**

63.     DEC and DOH have worked and continue to work together to investigate and respond to potential harms from PFOA/S contamination around the State as appropriate.  Among other things, if DEC or DOH identifies a potential site of concern, they may visit the site and determine whether public or private drinking water sources, groundwater, wildlife, or other resources should be sampled.  If warranted by sampling results and other considerations, DEC may provide water treatment systems for public or private drinking sources.  Consumers may be provided bottled water or connected to uncontaminated drinking water sources.  DOH and/or DEC also communicates with members of affected communities through public notices, public hearings, and door-to-door home visits when appropriate.  DOH also may offer blood sampling for people living in affected communities.

13

**Stewart Air National Guard Base and Stewart International Airport in Newburgh and New Windsor, New York**

64.     Stewart Air National Guard Base ("Stewart Air Base") is located in the Towns of Newburgh and New Windsor, New York and is adjacent to Stewart International Airport ("Stewart Airport"), a civilian airport that is located in the same two towns.  The National Guard operates at Stewart Air Base and also provides firefighting services and conducts firefighting training exercises at Stewart Airport.  Lake Washington, which is the primary drinking water supply for the City of Newburgh, is located approximately one mile to the southeast of Stewart Air Base and Stewart Airport.

65.     AFFF containing PFOA/S was stored and used at Stewart Air Base and Stewart Airport beginning as early as the 1980s.  During firefighting and firefighting training exercises, National Guard personnel sprayed AFFF containing PFOA/S directly on or near the ground, caused it to be disposed of in drains, and spilled it or otherwise caused it to discharge into the environment.  Additional discharges may have occurred in connection with automatic fire suppression systems, storage and handling of AFFF, or otherwise.  These activities resulted in discharges of PFOA/S from defendants' AFFF products at Stewart Air Base and Stewart Airport into Lake Washington and surrounding areas.

66.     On information and belief, AFFF products containing PFOA/S manufactured by each defendant were discharged into the environment at or from Stewart Air Base and/or Stewart Airport.  As mentioned above, defendants' AFFF products were listed on DOD's Qualified Products List and/or Qualified Products Database, enabling their distribution to both sites.  The National Guard has acknowledged that it used 3M and Tyco/Ansul AFFF at Stewart Air Base.  Additional evidence developed in the State's investigation shows that AFFF products

14

manufactured by 3M, Tyco/Ansul, and Chemguard were used, spilled, and/or stored at Stewart Airport.

67.     Sampling of surface water, groundwater, soil, fish, and other media at or near Stewart Air Base and Stewart Airport shows contamination by PFOA/S, substances that were components in defendants' AFFF products.

68.     In May 2016, DEC determined that Stewart Air Base was a source of significant contamination from PFOA/S in Lake Washington and surrounding areas.  DEC based this determination on its analysis of sampling results of surface water within runoff that flows from Stewart Air Base to Recreation Pond; Silver Stream, which runs from Recreation Pond to Lake Washington; Lake Washington; and surrounding areas.  DEC found, among other things:

- Concentrations of PFOA and PFOS combined in the runoff from Stewart Air Base to Recreation Pond as high as 6,080 ppt;

- Concentrations of PFOA and PFOS combined in Silver Stream as high as 335 ppt; and

- Concentrations of PFOA and PFOS combined in Lake Washington as high as 282 ppt.

69.     Subsequent investigations showed similar results.  Among other things:

- Sampling in June 2016 at Stewart Air Base showed concentrations of PFOA and PFOS combined as high as 8,470 ppt in surface water and 3,640 ppt in groundwater; and

- Sampling in August through October 2016 at Stewart Air Base showed concentrations of PFOA and PFOS combined as high as 3,890 ppt in groundwater.

70.     Sampling in June and July 2016 at Stewart Airport also showed concentrations of PFOA and PFOS combined as high as 940 ppt in groundwater, 306 ppt in surface water, and 1.85 parts per million ("ppm") in soil.

15

71.    In August 2016, DEC determined that contamination at Stewart Air Base poses a significant threat to public health or the environment and therefore designated it a "Class 2" site on the New York State Registry of Inactive Hazardous Waste Disposal Sites (the "Superfund Registry").

72.    In July 2017, DOH issued a "catch and release" advisory so that people would not consume fish contaminated with PFOA/S taken from several water bodies in the area, including Recreation Pond, Silver Stream, Lake Washington, Lockwood Basin/Masterson Park Pond, Moodna Creek, Beaver Dam Lake, and a stream that runs from Stewart State Forest to Beaver Dam Lake.

73.    The State has incurred substantial costs in connection with investigating and protecting the public from PFOA/S contamination from Stewart Air Base and Stewart Airport.

74.    The New York State Department of Transportation ("DOT") is an agency of the State and fee owner of real property located at Stewart Air Base and Stewart Airport. Defendants' AFFF products contaminated DOT's real property, including the underlying soils and other environmental media. DEC and DOT have incurred costs in connection with sampling and related activities in the area.

75.    In May 2016, the State began providing the City of Newburgh with drinking water from sources other than the contaminated water in Lake Washington. The State first helped Newburgh obtain drinking water from Brown's Pond, a nearby reservoir. Beginning in June 2016, the State provided Newburgh with water from New York City's Catskill Aqueduct.

76.    As a result of not using the water in Lake Washington, its water level rose and threatened the "high hazard" dam impounding that water. *See* 6 New York Codes, Rules & Regulations § 673.5(b) (defining a high hazard dam as one where a dam failure may result in loss

of human life or substantial economic loss, among other things).  DEC therefore lowered the water level of Lake Washington.

77.     In September 2016, the State began designing and constructing a granular activated carbon filtration system to remove PFOA/S from water Newburgh obtains from Lake Washington for its drinking water supply.

78.     The State also provided bottled water and installed point-of-entry treatment systems in homes in the Towns of Newburgh and New Windsor, and agreed to reimburse those towns for the costs of connecting their residents to municipal water supplies.

79.     In November 2016, DOH began sampling and monitoring the blood of residents in the Newburgh area for PFOA/S.

80.     The State has incurred other costs in connection with PFOA/S contamination in the Newburgh area.  In total, as of April 2018, the State had spent in excess of $37,000,000 responding to PFOA/S contamination in and around Newburgh, and it expects to spend substantial additional funds in connection with this effort.

**Francis S. Gabreski Airport in Southampton, New York**

81.     The Francis S. Gabreski Airport ("Gabreski Airport") is located in Southampton, New York and is owned by Suffolk County.  Gabreski Airport functions as a civilian airport and serves as a base for the National Guard, which conducts firefighting training exercises and provides firefighting services at the Airport.

82.     AFFF products containing PFOA/S were stored and used at Gabreski Airport beginning in at least the 1980s.  During firefighting and firefighting training exercises, National Guard personnel sprayed AFFF containing PFOA/S directly on or near the ground, caused it to be disposed of in drains, and spilled it or otherwise caused it to discharge into the environment.

Additional discharges may have occurred in connection with automatic fire suppression systems, storage and handling of AFFF, or otherwise. These activities resulted in discharges of PFOA/S from defendants' AFFF products at Gabreski Airport into public and private drinking water sources in the area.

83. On information and belief, AFFF products containing PFOA/S manufactured by each defendant were discharged into the environment at or from Gabreski Airport. As mentioned above, defendants' AFFF products were listed on DOD's Qualified Products List and/or Qualified Products Database, enabling their distribution to this site. The National Guard has acknowledged that it used "3M, Ansul, and non-spec AFFF" at this site.

84. Sampling of groundwater and soil at or near Gabreski Airport shows contamination by PFOA/S, substances that were components in defendants' AFFF products.

85. In July 2016, DEC sampled groundwater and soil at Gabreski Airport and determined that it is the primary source of PFOA/S contamination in the affected areas. DEC found, among other things:

- Concentrations of PFOA and PFOS combined in groundwater as high as 65,830 ppt; and

- Concentrations of PFOS in soil as high as 1.61 ppm.

86. In August 2016, DEC designated Gabreski Air National Guard Base as a Class 2 site on the Superfund Registry.

87. The State has incurred substantial costs in connection with its investigation of this PFOA/S contamination.

88. Additionally, in or around October 2016, DEC agreed to reimburse Suffolk County Water Authority up to $2,000,000 for its costs in responding to PFOA/S contamination in or around Gabreski Airport.

18

89.     Suffolk County Water Authority's costs arise from, among other things, extending water mains to provide municipal water to users of contaminated private water sources.

90.     As of March 2018, the State had incurred in excess of $1,800,000 in connection with investigating PFOA/S contamination at Gabreski Airport and in reimbursing Suffolk County Water Authority for its response actions.  The State expects to spend substantial additional funds in connection with this effort.

**Plattsburgh Air Force Base in Plattsburgh, New York**

91.     The former Plattsburgh Air Force Base ("Plattsburgh Air Base") is located in Plattsburgh, New York and is owned by Clinton County.  Plattsburgh Air Base closed in 1995 and now functions as a civilian airport known as Plattsburgh International Airport.

92.     AFFF products containing PFOA/S were stored and used at Plattsburgh Air Base beginning in the 1970s through at least the 1980s.  During firefighting and firefighting training exercises, Air Force and/or National Guard personnel sprayed AFFF containing PFOA/S directly on or near the ground, caused it to be disposed of in drains, and spilled it or otherwise caused it to discharge into the environment.  Additional discharges may have occurred in connection with storage and handling of AFFF, or otherwise.  These activities resulted in discharges of PFOA/S from defendants' AFFF products at Plattsburgh Air Base into nearby private drinking water sources in the area.

93.     On information and belief, AFFF products containing PFOA/S manufactured by each defendant were discharged into the environment at or from Plattsburgh Air Base.  As mentioned above, defendants' AFFF products were listed on DOD's Qualified Products List and/or Qualified Products Database, enabling their distribution to this site.  Additional evidence

developed in the State's investigation shows that AFFF products manufactured by Tyco/Ansul and Chemguard were and/or are stored and/or used at Plattsburgh International Airport.

94.    Sampling of groundwater, surface water, and soil at or near Plattsburgh Air Base shows contamination by PFOA/S, substances that were components in defendants' AFFF products.

95.    As reflected in the Air Force's April 2017 Draft Site Inspection Report for Plattsburgh Air Base ("Plattsburgh Draft Report"), PFOA/S contamination is present in groundwater, surface water, and soil at or around this site. Among other things, sampling conducted in connection with the Plattsburgh Draft Report showed:

- Concentrations of PFOA and PFOS combined in groundwater as high as 1,045,000 ppt;

- Concentrations of PFOA and PFOS combined in surface water as high as 2,279 ppt; and

- Concentrations of PFOS in soil as high as 3.5 ppm.

96.    Additionally, the Air Force found exceedances of PFOS in private wells near Plattsburgh Air Base.

97.    To date, DOD has reimbursed the State for the costs of its investigation of PFOA/S contamination at and/or around Plattsburgh Air Base. However, the State has costs in excess of $4,000 that it has not yet submitted to DOD for reimbursement, plus the costs of sampling fish for PFOA/S that will not be submitted to DOD for reimbursement. The State also expects to incur additional costs for its continuing investigation and/or remediation efforts that may not be reimbursed by DOD. Additionally, if the State's continuing investigation reveals that the State's natural resources have been injured, any resulting damages may not be reimbursed by DOD.

**Griffiss Air Force Base in Rome, New York**

98.     The former Griffiss Air Force Base ("Griffiss Air Base") is located in Rome, New York and is owned by Oneida County.  Griffiss Air Base closed in 1995 and now functions as a civilian airport known as Griffiss International Airport.

99.     AFFF products containing PFOA/S were stored and used at Griffiss Air Base and/or Griffiss International Airport beginning in the 1970s through at least the 1990s.  During firefighting and firefighting training exercises, Air Force and/or National Guard personnel sprayed AFFF containing PFOA/S directly on or near the ground, caused it to be disposed of in drains, and spilled it or otherwise caused it to discharge into the environment.  Additional discharges may have occurred in connection with automatic fire suppression systems, storage and handling of AFFF, or otherwise.  These activities resulted in discharges of PFOA/S from defendants' AFFF products at Griffiss Air Base and into creeks that flow through it.

100.    On information and belief, AFFF products containing PFOA/S manufactured by each defendant were discharged into the environment at or from Griffiss Air Base and/or Griffiss International Airport.  As mentioned above, defendants' AFFF products were listed on DOD's Qualified Products List and/or Qualified Products Database, enabling their distribution to this site. Additional evidence developed in the State's investigation shows that AFFF products manufactured by Chemguard were and/or are stored and/or used at Griffiss International Airport.

101.    Sampling of groundwater, surface water, and soil at or near Griffiss Air Base shows contamination by PFOA/S, substances that were components in defendants' AFFF products.

102.    As reflected in the Air Force's April 2017 Draft Site Inspection Report for Griffiss Air Force Base ("Griffiss Draft Report"), PFOA/S contamination is present in

groundwater, surface water, and soil at or around this site. Among other things, sampling conducted in connection with the Griffiss Draft Report showed:

- Concentrations of PFOA and PFOS combined in groundwater as high as 61,233 ppt;

- Concentrations of PFOA and PFOS combined in surface water as high as 1,029 ppt; and

- Concentrations of PFOS in soil as high as 1.6 ppm.

103. To date, DOD has reimbursed the State for the costs of its investigation of PFOA/S contamination at and/or around Griffiss Air Base. However, the State has costs in excess of $3,000 that it has not yet submitted to DOD for reimbursement. The State also expects to incur additional costs for its continuing investigation and/or remediation efforts that may not be reimbursed by DOD. Additionally, if future investigation reveals that the State's natural resources have been injured, any resulting damages may not be reimbursed by DOD.

**Potential PFOA/S Contamination at Other Sites**

104. As the State continues its investigation, it may discover other sites that will require remediation due to contamination with PFOA/S from AFFF. The State may also discover that natural resources have been damaged due such contamination.

105. Defendants should be required to fund the State's investigation of and remedial efforts related to contamination from other sites or to perform those activities themselves. Defendants should also be required to compensate the State for any injury to, destruction of, or loss of the State's natural resources.

## FIRST CAUSE OF ACTION
### Public Nuisance

106.     The State incorporates by reference the allegations contained in paragraphs 1 through 105 as if fully set forth herein.

107.     The storage and use of AFFF containing PFOA/S at the sites has threatened and/or injured drinking water, public health, the environment, property, and the State's natural resources, thus causing a public nuisance.

108.     Defendants participated in the creation and/or maintenance of this public nuisance through, among other things, their marketing and sale of AFFF products with defective designs and without providing adequate product instructions or warnings about the risks to drinking water, public health, the environment, property, and natural resources posed by the PFOA/S in their products.

109.     Defendants are strictly, jointly, and severally liable to the State for all resulting damages, including the costs incurred and to be incurred in responding to the threats and/or injuries to drinking water, public health, the environment, property, and the State's natural resources from PFOA/S contamination; damages for the public's lost use of the State's natural resources; the costs of assessing the injury to, destruction of, or loss of those natural resources, including the costs of experts to assess the damage; and property damage.

110.     The State is entitled to an injunction requiring defendants to abate the public nuisance.

111.     On information and belief, defendants knew or should have known that their products would result in a public nuisance.  On information and belief, defendants' conduct involved actual malice or wanton, willful, and reckless disregard for the health, safety, property,

and rights of others.  The Court should award the State punitive damages in an amount sufficient to deter and punish such conduct.

## SECOND CAUSE OF ACTION
### Strict Products Liability for Defective Design

112.    The State incorporates by reference the allegations contained in paragraphs 1 through 105 as if fully set forth herein.

113.    Defendants have strict duties not to market products with defective designs, that is, products that are not reasonably safe when stored and used in a foreseeable manner.

114.    Defendants breached these duties by marketing AFFF products containing PFOA/S.

115.    AFFF products containing PFOA/S are not reasonably safe because the substantial likelihood of harm to drinking water, public health, the environment, property, and natural resources from their storage and use outweighs their utility.  On information and belief, AFFF products containing PFOA/S are not reasonably safe because it is feasible to design them in a safer manner: without PFOA/S or with additional features or procedures to eliminate or minimize the likelihood of harm from PFOA/S.

116.    As a proximate result of defendants' marketing of defectively designed AFFF products containing PFOA/S, these products were purchased or otherwise acquired by DOD or others and stored and used at the sites in a foreseeable manner, resulting in threats and/or injuries to drinking water, public health, the environment, property, and the State's natural resources.

117.    Defendants are strictly, jointly, and severally liable to the State for all resulting damages, including the costs incurred and to be incurred in responding to the threats and/or injuries to drinking water, public health, the environment, property, and the State's natural resources from PFOA/S contamination; damages for the public's lost use of the State's natural

resources; the costs of assessing the injury to, destruction of, or loss of those natural resources, including the costs of experts to assess the damage; and property damage.

118.    On information and belief, defendants knew or should have known that their products would result in substantial threats and/or injuries to the State.  On information and belief, defendants' conduct involved actual malice or wanton, willful, and reckless disregard for the health, safety, property, and rights of others.  The Court should award the State punitive damages in an amount sufficient to deter and punish such conduct.

## THIRD CAUSE OF ACTION
### Strict Products Liability for Failure to Warn

119.    The State incorporates by reference the allegations contained in paragraphs 1 through 105 as if fully set forth herein.

120.    Defendants have strict duties not to manufacture, sell, and distribute products without adequate warnings about latent dangers resulting from the foreseeable manner of storage and use of their products of which they knew or should have known.

121.    On information and belief, defendants breached these duties by failing to warn about latent dangers to drinking water, public health, the environment, and property from storing and using AFFF containing PFOA/S, because defendants knew or should have known that such dangers would result from the foreseeable manner of storage and use of this product.  On information and belief, defendants failed to warn about the existence and nature of the latent dangers, the magnitude of those dangers, and how to prevent or minimize those dangers.

122.    As a proximate result of defendants' marketing of AFFF containing PFOA/S without adequate warnings about latent dangers, these products were purchased or otherwise acquired by DOD or others and stored and used at the sites in a foreseeable manner, resulting in

avoidable threats and/or injuries to drinking water, public health, the environment, property, and the State's natural resources.

123.    Defendants are strictly, jointly, and severally liable to the State for all resulting damages, including the costs incurred and to be incurred in responding to the threats and/or injuries to drinking water, public health, the environment, property, and the State's natural resources from PFOA/S contamination; damages for the public's lost use of the State's natural resources; the costs of assessing the injury to, destruction of, or loss of those natural resources, including the costs of experts to assess the damage; and property damage.

124.    On information and belief, defendants knew or should have known that their products would result in substantial threats and/or injuries to the State.  On information and belief, defendants' conduct involved actual malice or wanton, willful, and reckless disregard for the health, safety, property, and rights of others.  The Court should award the State punitive damages in an amount sufficient to deter and punish such conduct.

## FOURTH CAUSE OF ACTION
### Restitution

125.    The State incorporates by reference the allegations contained in paragraphs 1 through 105 as if fully set forth herein.

126.    The storage and use of AFFF containing PFOA/S at the sites has threatened and/or injured drinking water, public health, the environment, property, and the State's natural resources.

127.    Defendants caused these threats and/or injuries.

128.    Defendants had and have duties to abate these threats and/or injuries.

129.    Defendants have failed to fulfill their duties.

26

130.    The State has discharged the duties of defendants to abate these threats and/or injuries, and absent complete injunctive relief, the State will continue to discharge those duties.

131.    By discharging the duties of defendants to abate these threats and/or injuries, the State has conferred a benefit upon defendants, and absent restitution, defendants are unjustly enriched.

132.    Defendants are jointly and severally liable to the State for the reasonable value of the benefit conferred upon them by the State.

### PRAYER FOR RELIEF

WHEREFORE, the State requests judgment in its favor and against defendants as follows:

a.    Holding and declaring all defendants to be strictly and/or jointly and severally liable to the State on the claims set forth above, and awarding the State damages consisting of its costs incurred and to be incurred in responding to the contamination caused by defendants' products; damages for injury to, destruction of, and loss of the State's natural resources and the recreational and other services those natural resources provide, including the costs of assessing such damages and the costs of experts needed to make such an assessment; and property damage, in an amount not less than $38,807,000;

b.    Ordering injunctive and equitable relief in the form of a monetary fund for the State's reasonably expected future response costs as set forth above; and/or requiring defendants to perform investigative and remedial work in response to the threats and/or injuries they have caused; plus damages for injury to, destruction of, and loss of the State's natural resources;

c.    Awarding punitive damages in an amount to be determined at trial; and

d.    Awarding such other and further relief the Court deems just, equitable, and proper.

27

Dated: Albany, New York
June 19, 2018

BARBARA D. UNDERWOOD
Attorney General of the State of New York
Attorney for Plaintiff


By: /s/ Matthew J. Sinkman
Matthew J. Sinkman
Philip Bein
Assistant Attorneys General
Environmental Protection Bureau
The Capitol
Albany, New York 12224
Matthew.Sinkman@ag.ny.gov
Philip.Bein@ag.ny.gov
(212) 416-8446
(518) 776-2413

28